## OYER AND TERMINER.

### PHILADELPHIA, MAY, 1816.

*The Commonwealth*
vs.                } MURDER.
*Richard Smith.*

*Jared Ingersoll* and *Edward Ingersoll, Esquires*, Counsel for the Commonwealth.

*William Rawle, Peter A. Browne*, and *J. B. Smith, Esquires*, Counsel for the Prisoner.

The facts of the case, and the law arising from them, are embraced in the charge of the president.

RUSH, Justice. I request your attention to what I am about to say to you, and I also request that you would consider this charge as proceeding from the whole court.

The prisoner at the bar, Richard Smith, is indicted for the murder of John Carson, by shooting him through the head, on the 20th January last.

There is not the least doubt he died of the wound, after languishing till the 4th of February.

It is your duty to decide, by your verdict, taking into consideration all the circumstances of the case, whether he be guilty of murder or not.

'A jury has a right in criminal cases to give a special or a general verdict. A special verdict states all the material facts, and submits to the court the question of law arising on these facts. This is not usual, and is not expected by this court.

A general verdict is where the jury, in general terms, say the prisoner is guilty or not guilty.

From the right which the jury has, to give a general verdict in all criminal cases, it follows they have incidentally a right to determine both the law and the facts, which are often almost inseparably connected with each other.

What says the constitution upon this point?

In indictments for libels, the jury shall have a right to determine the law and the facts under the direction of the court, as in other cases.

From the evidence it appears that John Carson, the deceased, was married to Ann Baker, in June, 1801, and that she was afterwards married in the month of October, 1815, to Richard Smith, the prisoner in the bar.

It is made a question whose wife she was on the 20th of last January, the day on which Carson fell by the hands of Smith?

It is provided by our divorce law, where a man leaves his family for two years, and his wife marries after that time, in consequence of a report, apparently well ground-

ed, that her husband is dead, that in such case she is not
guilty of adultery; and .that the husband, on his return,
may insist on having his wife back again, or to be di-
vorced from her; and that he may institute a suit for a
divorce within six months after his return.  ·

To make the marriage of a wife lawful, in any degree,
under this act, two things are expressly required by the
very words of it.

1st. That the husband has been two years absent.
2d. That a rumor existed of the death of the husband.
The marriage must be founded in both circumstances to
give it validity.

What is the evidence in this case? There is no doubt
that Capt. Carson had been absent two years at the time
his wife was married to the prisoner; but the other cir-
cumstance, viz., the report or rumor of the death of
Capt. Carson, has not been made out in proof. To jus-
tify the second marriage of Mrs. Carson, there should
be evidence of a rumor of this description. What is
the meaning of the expression "a rumor of the death of
a man *in appearance* well founded"? We think it means
general report that a man died at a particular town or
place, was shipwrecked, or lost his life in some way,
which the report specifies. It appears to the court that
the expression, " in appearance well founded," has refer-
ence to the place and manner of his death. No such
evidence has been given. Jane Baker only says, " there
was a rumor of Carson's death; a sailor said so." This
loose evidence is not the evidence the law requires to

justify a wife's marrying in the absence of her husband. There must be a general report of his death, and of the place and manner of it.

There not being the evidence required by law, to authorize the marriage of Ann Carson with the prisoner in the bar, it is clearly the opinion of the court that it was, to all intents and purposes, null and void. This being the case, it follows that she was guilty of adultery with Smith; that the rights of Smith, as a third person, have no legal foundation or existence; that Carson had an undoubted right to proceed at law against his wife for a divorce, and to settle with her, and withdraw the suit, whenever he thought proper, without the consent of the prisoner, or any other person. The law now under consideration supposes a case of this very kind, by enacting, that in any suit for a divorce on the ground of adultery, if the defendant shall prove that the plaintiff admitted the defendant into conjugal embraces after he knew she had been guilty of adultery, it shall operate as a perpetual bar to his obtaining a divorce.

We go farther, and state to you upon that point, that Ann Carson could not have two husbands at the same time. She could not be at the same time the wife of John Carson and the prisoner.

She was unquestionably once the wife of John Carson, and nothing but death or divorce could dissolve the connection. These are the only two modes known to the law of terminating the marriage contract.

It is stated by the defendant's counsel, that a subpœna

for the purpose of a divorce, is so decisive of the intent of the party, that he cannot alter or change his intention. This is strange language, and is equivalent to saying, the bringing a suit for divorce, and the decree in the case, are equally binding on the party. Where would be the use of the decree, if the subpœna was conclusive in the libellant? We are, therefore, clearly of opinion, that on the 10th of January last Ann Carson was the wife of John Carson, and that he had a right to settle his differences with his wife, and to receive her again into his arms.

It being universally understood and known that the property of the wife is the property of the husband, and that he alone has the control over it; the consequence is that John Carson had an undoubted right to take possession of the house and goods which belonged to his wife, on his return in January last to this city, and to his family. It follows, that Richard Smith, the prisoner, was an intruder, and had acquired unlawful possession of the wife, of the house, and of the goods and chattels of John Carson.

This point being settled, we proceed to remark, that the crime of murder essentially consists in taking away the life of a fellow-creature, with circumstances that show a vindictive temper and malignity of heart.

It is not the design of the court to distract your minds, or fatigue your attention, by a tedious discussion on the law of murder. We shall endeavor to make you understand so much of this subject, that you may be able to form a correct judgment on the question submitted to

PHILAD'A,
May, 1816.

The Com'th
v.
Smith.

you. It will be proper to state a few leading principles that have received the sanction of the highest judicial authority in this state, subsequent to the passing the law of 1794.

In the case of the Commonwealth v. Mulatto Bob, tried at Easton in 1795, before Chief Justice M'Kean and Judge Smith, it was decided by the court, that, since passing the law of 1794, the intention still remains the criterion of the crime; that the intention of the prisoner is to be collected from his words and actions; and that on the supposition a man, without uttering a word, should strike another on the head with an axe, it would be deemed premeditated violence.

In the case of The Commonwealth v. O'Hara, tried before Chief Justice M'Kean and Judges Shippen and Smith, in Philadelphia, in the year 1797, the court held, if the murder be committed with an instrument likely to kill, it is wilful; and that to make it deliberate and premeditated, the party must have time to reflect and to frame the design, however short the time may be, and must intend to kill.

If the defendant has time to think, and did intend to kill, for a minute, as well as an hour or a day, it is a deliberate, wilful and premeditated killing, constituting murder in the first degree, within the act of assembly.

We shall presently examine the conduct of the prisoner, and compare it with the principles laid down in these cases.

In the mean time, we observe to you, gentlemen, that

the principles just stated are from the highest judicial authority in Pennsylvania, and that it is the duty of this court, and of you as jurymen, to submit to them.

For a moment, however, gentlemen, let us inquire into their correctness.

The *wilful, deliberate* and *premeditated* killing a person is, by the law of 1794, described to be murder in the first degree.

What is it to kill a person wilfully? It is the same thing as killing him on purpose. He who does an act wilfully, does it on purpose, and he who does an act on purpose, does it wilfully.

The next ingredient to make the killing murder in the first degree is, it must be deliberate. But does the law fix the time of such deliberation? No such thing, gentlemen. Does it say, the prisoner must ponder over the crime for years, for months, for weeks, or days, or hours, or for any other given time? What sort of a law would it be, if such construction were put upon it by courts and juries?

Suppose, for example, it should be contended, that it must appear the party had pondered on the commission of the crime one hour or five minutes before the fact.

I ask, then, why fix an hour or five minutes for deliberation? Why not half an hour? why not two hours? why not two minutes?

The truth is, in the nature of the thing, no time is fixed by the law, or can be fixed, for the deliberation required to constitute the crime of murder.

To deliberate is to reflect, with a view to make a choice; and if it appeared that the party did reflect, though but for a minute, before he acted, it is unquestionably a sufficient deliberation within the meaning of the act of assembly.

The last requisite to constitute murder in the first degree is, that the killing must be premeditated.

To premeditate is to think of a matter before hand; it is to conceive of a thing before it is executed. The word premeditated would seem to imply something more than deliberate, and may mean that the party had not only deliberated, but had framed in his mind the plan of destruction.

We therefore say to you, gentlemen, and we say it confidently, that it is equally true, both in fact and from experience, that no time is too short for a wicked man to frame in his mind a scheme of murder, and to contrive the means of accomplishing it.

Gentlemen, it is well known that certain acts will so far justify a man, that his killing another will not be murder. There are also other acts that are not a sufficient provocation to justify killing a person.

For example, the demand of a debt is not a provoca-

tion to justify killing.  It is, therefore, murder to kill a man in the act of asking the payment of a debt.

PHILAD'A,
May, 1816.

The Com'th
v.
Smith.

Further, gentlemen.  It is a principle of law, .that no breach of a man's word or promise—no trespass either to lands or goods—no affront, by word or gesture, will excuse a person from the crime of murder, if he becomes so far transported as to kill the person who then offends him.

Apply this to the facts before you.  Suppose, then, the house was in fact Smith's, and that Carson, in going there on Saturday to demand the possession of his family, was a trespasser : it is the opinion of the court, that Smith's killing him, under these circumstances, in the very act of making such peaceable demand, is, in every principle of law, murder in the first degree.

To recapitulate all the testimony that has been laid before you, would be an endless task, and I add, a useless task ; because, on this trial, as on all others, a great deal of evidence has been given that has no more bearing on the merits of the case, than one of Æsop's Fables, or a chapter from Don Quixote.  Evidence of this description it is not our practice to take down in writing.

The material facts in this cause seem to be these : On the 20th of January last, at about 11 o'clock at night, the prisoner in the bar shot John Carson through the head, of which wound he died on the 4th of the next month. . That on Wednesday, the 17th of January, the prisoner and the deceased dined together at the house

of John Carson, the corner of Second and Dock streets. On this occasion John Carson got into a rage at seeing the prisoner assume the direction of his children and his servants, and, seizing a knife, made an attempt to strike him ; the prisoner laid hold of his arm, on which the deceased, with the other arm, took up another knife. Mrs. Carson attempted to hold her husband ; but, breaking loose, he ran down stairs, with two knives in his hands, in pursuit of Smith, who had gone off without his hat. Upon Mrs. Carson telling her husband if he wanted to commit murder, to murder her, he exclaimed, Murder ! Yes ! The evening of this very day, the prisoner was seen in the kitchen with a pair of pistols, one of which was loaded : that he then declared, "that if Carson entered the door, to lay hands on him, he would certainly shoot him." In consequence of this violence of John Carson, he was, on the application of the prisoner, bound over the next day to keep the peace.

The next interview between the prisoner and the deceased was on Saturday evening, which terminated the mortal career of John Carson, in the manner you have heard.

On this fatal evening, Carson came to his house between 7 and 8 o'clock, when Mrs. Carson and Smith both left it. Carson then sent for Thomas Baker and Jane Baker, the parents of Mrs. Carson, who, about 10 o'clock, went to the house. On coming there, they found Carson in the china store : he and they went up stairs into the parlor. Between 10 and 11 that evening, Thomas Abbot went home, and being informed that Mr. and Mrs. Baker, who lived under his roof, had gone to

Mrs. Carson's, he determined to follow them there. When he got near the house, he saw Mrs. Carson, and went with her into the office of Jonathan B. Smith, in the neighbourhood of Carson's house. The prisoner came in soon after, and asked Jonathan Smith to give him *the* pistol, which was refused. Mrs. Carson then said, let us go—*you know where there is one.* The prisoner swore, *if Carson attempted to touch him he would kill him.* The prisoner, Mrs. Carson, and Thomas Abbot, left the office of J. B. Smith together, and on coming to the house of Carson, Abbot staid below, and Mrs. Carson and the prisoner went up stairs. In about a *minute,* Abbot following them up stairs, passed the prisoner standing in the entry, with his right hand upon his breast, under his surtout coat, and his left hand also on his breast; he went into the parlour, where he found Capt. Carson, Mrs. Carson, Thomas Baker, and Jane Baker. Abbot had not been in the room more than half a minute, when the prisoner came in, and stood near the door, in the same attitude in which he appeared in the entry; that is, he had his right hand *under* his surtout, buttoned at top and bottom, and his left hand on his breast over his right hand. Capt. Carson then got up, and told the prisoner he had come to take peaceable possession of his house—that out of the house he must go. The prisoner then said, very well, and turning to Mrs. Carson, said, Ann, shall I go? Who replied, No, stay. The prisoner then went to the north-east corner, and Carson following him, told him again, and repeated, two or three times, he must leave the house—" my hands are tied—I have no weapon ;" at this time he held his hands down by his side, and open, had nothing in his hands. Upon this, Smith drew a pistol from under his

PHILAD'A,  surtout coat, and shot Carson in the mouth ; and throwing
May, 1816.  the pistol on the floor, ran down stairs as fast as he
The Com'th,  could.    Capt. Baker pursued him, heard him tumble
v.  among the china, and overtook him on the step of the
Smith.  front door.    Smith, the prisoner, when conveyed to gaol,
had his nose injured, and bloody.    The deceased declar-
ed in his last illness, that the prisoner had come in like
a midnight assassin, and shot him like a coward.    It was
further in evidence, that Smith might have left the corner
in the parlour without running against any body.

From this evidence, the question presented to you is,
of what crime is the prisoner guilty ?

Murder in the first degree, is the wilful, deliberate, and
premeditated killing another.    There are various inferior
kinds of homicide.    But on the present indictment, our
attention is confined to the consideration of the highest
and most aggravated description of the crime.

Then let us ask, did the prisoner wilfully kill John
Carson ?

It is not pretended there was any accident in the case.
The killing, therefore, was wilful, and on purpose.

Was it deliberate and premeditated ? or was it the
effects of a sudden passion, produced by a reasonable
provocation ?

There is no evidence to show a sudden passion, or
that the prisoner had, that evening, received any provo-
cation from the deceased.    All the witnesses who were

present agree, that Carson did not touch him, or lay the weight of his finger upon him.

The killing, therefore, was not the effect of a sudden passion : but was it deliberate, gentlemen ?   Look at the prisoner standing in the entry, with the pistol buried under his surtout; see him entering the parlor, in the same attitude, taking his stand, drawing the pistol, and coolly discharging it into the mouth of Carson, and ask yourselves whether this was not a most deliberate act.

Was the killing premeditated ?   On Wednesday night he had prepared himself with pistols, and declared, if ever Carson entered the door, to lay hands on him, he would certainly shoot him.   On Saturday evening he made a similar declaration.   He did not, however, wait till Carson touched him, but shot him, without receiving from him the least personal injury, or even threat.

In the language of Chief Justice M'Kean, we add, that where a man, without uttering a word, strikes another man on the head with an axe, it is an act of premeditated violence.

What is the language of the court in the case of The Commonwealth v. O'Hara ?   If the prisoner had time to think, and did intend to kill for a minute, it is wilful, deliberate and premeditated killing, as well as if he had intended to kill for an hour or a day.

With respect to the conduct of Carson at his own house, on Wednesday, in drawing a knife on Smith, it was altogether unjustifiable.   What would have been the

consequence if he had killed him, we are not now called upon to decide. This we will say, that two wrongs cannot make a right; that Carson's violence on Wednesday can never justify Smith in deliberately killing Carson on the Saturday following.

Who is there among us that will justify assassination? Nobody, I trust. But it will be quite as easy to justify assassination on the principle of revenge, as the conduct of the prisoner in deliberately shooting Carson through the head three days after Carson had injured him.

Much has been said of the principle of self-defence, as applied to the prisoner; but with what propriety we are at a loss to discover. Who laid hands on him? who attacked him? who threatened him? who touched him?

He went voluntarily into the room, chose his station, and fired when he pleased. He was not dragged into the room, and there detained against his will. On the contrary, *he* only was armed, and under restraint from no person.

It has been said by one of the witnesses, that the pistols were procured for self-defence. If this be really the case, it is much to be lamented they were employed for a most mischievous and deadly purpose.

The dying declarations of John Carson are of weight in this cause, who averred, when he lost all hopes of living, that the prisoner had come like an assassin, and

shot him like a coward.  This description of the offence of the prisoner accords very much with the representations of it given by the witnesses.

The flight of the prisoner is always, in the eye of the law, evidence of guilt.  Smith had no sooner discharged the fatal instrument, than it was dashed on the floor, and he fled from the room with the utmost speed.  His fall among the china, the difficulty of getting through the street door, which opened inwardly, and his stumbling at the front door, were the providential circumstances that prevented his escape.

The man who has committed no crime, in general faces his accusers, and maintains his innocence.  On the other hand, the guilty creature, who knows he has exposed himself to the just vengeance of the law, is uniformly seen to endeavor to avoid by flight that punishment which he is conscious he has merited at every earthly tribunal.

A good deal has been said of the history of Captain Carson's life and character.  Alas! gentlemen, it is the melancholy history of his death you are called upon to hear and to decide.  He had settled his difference with his wife on Friday ; and, anxious for re-union, had formed a plan of getting possession of his house on Saturday, the next day.  He very naturally, therefore, sends for his wife's nearest connections to be witnesses of his ordering the prisoner to quit his house.  It is plain, they were not sent for to assist him to take possession by force, because they came without arms, and no force was used.  But, whatever was his motive, it was so or-

dered by Providence, that it was an invitation to his death and funeral.

It is true, gentlemen, Smith did go on Saturday night to look for a magistrate, to turn Carson out, as he expressed it. Being disappointed, he resolved to take the law in his own hands, and deliberately procuring a pistol, went forward into the room where he knew Carson was, and coolly discharged its contents into his head.

Justice is certainly due to the prisoner in the bar—no body doubts it.

But is Justice due to Richard Smith only? Is no justice due to the public—is no justice due to society? Is the life of a man of no value? Is no atonement to be made to offended law, for the shedding of innocent blood? Judge for yourselves, gentlemen.

Punishment is not the province of a court and jury. Our rulers, the legislature of our country, have established a penal code, assigning to each crime its proper punishment. Upon this point we have no right to reason : acquiescence is our duty.

I will however observe, gentlemen, that the practice of all nations, civilized and barbarous, accords with the voice of religion, which is the voice of God : whoso sheddeth man's blood—that is, deliberately sheds it—by man shall his blood be shed.

What is the case before you in substance, and in a few words? It is this—

.The prisoner having, by color and forms of law, acquired unlawful possession of the house of Carson, of his goods and chattels, of his wife and children, deliberately shot him afterwards in his own house, in the very act of peaceably demanding restitution of all that was dear to him.

It is a fine reflection of chief justice Hale—"Let me remember," says that great and good man, "when I find myself inclined to pity a criminal, that there is also pity due to the people and to the country."

The court have done their duty—it remains with you to do yours.

Remember, gentlemen, the vows of God are upon you, to decide according to law and to evidence.

We have stated both the law and the facts, and leave you to judge for yourselves : you have a right to determine both.

If you believe the witnesses, who were present and saw the crime committed, it is your duty to convict the prisoner of murder in the first degree ; but if you do not believe the witnesses, it is your duty to acquit him.

The jury found the prisoner guilty, and he was executed in pursuance thereof.